EDWARDS, JUDGE PRO TEMPORE, J.
Defendant appeals his conviction for second degree murder. For the reasons that follow, defendant's conviction and sentence are affirmed.
PROCEDURAL HISTORY
On July 20, 2016, a grand jury in the Twenty-Ninth Judicial District returned a bill of indictment that alleged defendant, Javon Wells, had committed second degree murder of Kendall Williams on or about May 4, 2016. On July 26, 2016, defendant pled not guilty at arraignment. The matter proceeded to a jury trial on May 23, 2017, and on May 25, 2017, defendant was found guilty as charged. Defendant's motion for new trial was denied on July 11, 2017, and, on that same date, he was sentenced to life in prison at hard labor without benefit of probation, parole or suspension of sentence. This timely appeal followed.
FACTS
At trial, Isis Miller testified that she had been a classmate of the victim, Kendall Williams ("Williams"), at Destrehan High School, and that she and Williams had also dated prior to his death. Williams would visit Miller in New Sarpy and they would spend time together at her grandmother's residence or in the community park. Williams also had close friends in New Sarpy that he would spend time with, "Lamar," and "Lou Donovan" who lived in close proximity to the park. Miller stated that she was not aware that Williams had any enemies who lived in the New Sarpy area.
Miller was with Williams on the day he was killed, first at a graduation party and later at a pavilion in the park. After meeting for 45 minutes in the park, Williams walked her back to her grandmother's house and they made plans to go to the mall the following day. It was the last time *1207 that Miller saw him. Upon leaving her grandmother's house, she saw numerous policemen nearby. Later that evening, she learned that Williams had been shot in the head.
On cross-examination, Miller testified that she had told detectives that she and Williams arrived at the park at 7:00 p.m. and spent approximately one hour there, prior to when he was shot. She did not recall seeing defendant, Javon Wells, at the park on that day.
Lou' Donovan Wells ("Lou' Donovan") testified that he knew Williams, and had been friends with him for four years prior to Williams' death. Lou' Donovan was with Williams on the date he was shot and had spent time with him and others, including Lou' Donovan's brother, Lamar Walker, "under the gazebo" in New Sarpy. Lou' Donovan grew up in the area near the gazebo, and his home on East Hoover St. was nearby. To his knowledge, Lou' Donovan was not aware that Williams had any enemies in the area. Lou' Donovan stated that Williams was still at the gazebo with his friends when he left, and later he saw Williams walking with Isis Miller to her grandmother's house. Approximately 20 minutes after walking with Isis, Williams returned to the gazebo alone, and joined Lou' Donovan, "JJ"[1] , Gerald Young, and his brother, Lamar Walker.
Lou' Donovan saw defendant, who is his first cousin, approach the gazebo and the two briefly "dapped off," which is a form of greeting. Lou' Donovan then started to return to his bench in the middle of the gazebo, when Williams was shot. Lou' Donovan did not see defendant draw a weapon before he shot Williams, who was looking at his phone at the time. He did see after the shooting, however, that defendant was holding a small gun in his hand. Williams and defendant did not argue just before the shooting. After shooting Williams, defendant walked straight back to the street and "just left." Lou' Donovan explained that the entire incident happened very quickly.
Lou' Donovan testified that he believed his brother had "walked off" at the time of the shooting, but came back shortly thereafter to see Williams on the ground. JJ was standing behind the middle bench of the gazebo at the time the single shot was fired.
Shortly after the shooting, Lou' Donovan was "in shock," became very "emotional" and "overwhelmed," and then took off his shirt and work hat, throwing them into the street. He stayed in that state until "Miss Branette" arrived and called the police using his cell phone. When the police arrived, they put Lou' Donovan and his brother, Lamar, in the back of a car and drove them to the police station. Lou' Donovan said that he was a little reluctant to name defendant, his cousin, as the shooter, but he told detectives the truth about what happened. Lou' Donovan did not recall if he told detectives that night whether JJ was present at the time of the shooting. Lou' Donovan had no doubt that defendant was the person who killed Williams. Lou' Donovan identified a map that was shown to him by the State, which he had used to show the detectives where everyone was located at the time Williams was shot.
On cross-examination, Lou' Donovan denied telling detectives that he only "thought" defendant had killed Williams. Lou' Donovan stated that Williams had been back from walking Isis Miller to her grandmother's house for approximately 15 minutes before he was shot. He did not call 911 prior to the time that Branette Chopin arrived. Lou' Donovan said that he never *1208 told detectives that he "saw a guy with dreads" at the scene of the shooting, but rather that defendant had dreads (dreadlocks). When asked by defense counsel, Lou' Donovan admitted that he had to be arrested and held on a material witness bond to compel his trial testimony.
On re-direct examination, Lou' Donovan testified that there was no clock underneath the gazebo. He also stated that he did not know anything about firearms, nor could he identify the gun defendant used to kill Williams.
Lamar Walker ("Lamar") testified that he and Williams had known each other since sixth grade and that the two were close. Lamar and Williams were together on the day of the shooting at the gazebo across the street from the house where Lamar grew up. Lamar went to meet Williams after speaking with him on the phone and learning that Williams and his brother were going to get together in New Sarpy that day. Lamar met with Williams, his brother Lou' Donovan, and Gerald at the gazebo. At some point, Isis Miller came to meet Williams for approximately one hour around sundown. Williams walked Isis to her grandmother's house then returned to the gazebo. While Lamar started walking toward Williams inside the gazebo, he saw defendant standing over by his brother. Defendant was wearing a black shirt and had a dreadlock hairstyle. Lamar then saw defendant walk up to Williams and shoot him in the back of the head. Lamar only heard one single gunshot. Lamar ran for safety, while in shock. When Lamar returned to the gazebo, the police were on the way to the scene of the shooting. At that time, Lamar saw his brother, Gerald, and "Miss Branette." He was there when the police arrived.
Lamar was brought to police headquarters, where he gave a statement. He identified a drawing he had made at the police station which showed the positions of Williams, defendant, and his brother. Lamar testified that he was certain that defendant was the person who shot Williams that night.
On cross-examination, Lamar stated that he gave a second statement at the St. Charles Parish Police Department on July 7th, two months after the shooting. Although he heard his brother "holler" before the gunshot, he did not recall telling the detective that in his first statement. In his first interview, Lamar told the detective that his brother did not say the name of the shooter immediately after the victim was shot and, at that time, the detective told him that his brother had identified defendant as the shooter. At that time, Lamar also identified defendant as the person who shot Williams. Lamar denied telling the detective in his first interview that he had not seen defendant shoot anyone. He also denied telling detectives that he did not see a gun, and stated that he saw defendant holding a small black gun. Lamar did not recall seeing defendant and his brother "dap off."
On re-direct examination, Lamar testified that witnessing Williams get shot was a traumatic experience. He stated again that he was "100% sure" that he saw defendant shoot Williams. He also stated that he had no issues with defendant.
Branette Chopin testified that she knew both Lamar Walker and Lou' Donovan Wells. On May 4, 2016, she saw a body under the gazebo lying down while she was traveling home. She pulled her car over and saw Lou' Donovan Wells acting "crazy" and "wild," so she parked. She asked Lou' Donovan what had happened. Lou' Donovan told her that "somebody passed by in a car and shot the little boy." When Lou' Donovan was unable to call 911, Chopin took the phone from him and made the call herself. Chopin said that Lou' Donovan was jumping up and down, crying, and *1209 hitting his head on the ground. She tried to get a member of Lou' Donovan's family to go to him, but was unsuccessful. Chopin said that when she arrived at the gazebo, the only persons there were JJ, Lou' Donovan, and the victim. After trying to get a member of Lou' Donovan's family to go see him, she returned to the gazebo and saw Lamar Walker there as well. Chopin did not speak to police on the night of the murder, as they did not ask her any questions.
On cross-examination, Chopin confirmed that Lou' Donovan Wells did not identify defendant to her as Williams' shooter. She also did not see defendant running away from the gazebo on that night. On re-direct examination, Chopin stated that when she did ultimately meet with a detective to give her statement, she told the detective that she did not believe the explanation that the victim was shot in a drive by shooting.
Dr. Dana Troxclair testified that she is a forensic pathologist employed by the Jefferson Parish Coroner's Office. It was in that capacity that she performed an autopsy on Kendall Williams on May 5, 2016. Dr. Troxclair explained that the examination of the victim showed a single gunshot wound to the head, with no exit wound, as well as an abrasion on his forehead. The bullet was lodged at the base of the victim's brain. Dr. Troxclair opined that the victim could not have survived the gunshot because of the damage it caused. The bullet traveled from the back of the skull toward the front. There were no drugs or alcohol in the victim's blood. The cause of death was a gunshot wound, and the manner of death was classified as a homicide.
On cross-examination, Dr. Troxclair stated that the position of the shooter could not be determined from information obtained at the autopsy. However, based upon the stippling around the wound, it appeared that the shot was fired within inches of the victim's skull.
Sergeant Jake Schnapp of the St. Charles Parish Sheriff's Office testified that he was dispatched to the scene of a shooting on May 4, 2016. When he arrived, Sergeant Schnapp saw a black male in the middle of the street who was visibly upset, and a black female on the phone who was also visibly upset. The black male approached him and said, "He killed my boy." Sergeant Schnapp went over to the gazebo and saw a black male lying face down with a single gunshot wound to the back of the head. At that time, Sergeant Schnapp contacted EMS and requested that the detective bureau be notified. Two black males at the location were transported to sheriff's office headquarters. Once the scene was processed and the victim's body was removed, officers were informed by the detective bureau that a suspect, Javon Wells, had been identified. Shortly thereafter, Javon Wells was located and taken into custody. Sergeant Schnapp testified that he had no further involvement in the case from that point.
Deputy Harold Kingsmill of the St. Charles Parish Sheriff's Office testified that he was dispatched to the scene of a shooting in New Sarpy on May 4, 2016. After arriving, he went to the gazebo and saw the victim on the ground. Deputy Kingsmill then secured the scene with crime scene tape. Later that evening, Deputy Kingsmill was one of the officers who identified and arrested defendant while he was walking around the neighborhood.
On cross-examination, Deputy Kingsmill stated that defendant had a laptop in his hand when he was arrested.
Sergeant Jeremy Pitchford testified that he was assigned to the Criminal Investigation Division for the St. Charles Parish Sheriff's Office, and was the lead detective involved in the investigation that resulted *1210 in the arrest of defendant. On May 4, 2016, Sergeant Pitchford was told about a homicide in New Sarpy by his Lieutenant. He went to the scene of the shooting and began investigating. He was informed that two witnesses had been taken into custody. Defendant was identified as a suspect in the shooting, and a warrant was prepared for his arrest. Defendant was taken into custody by Deputy Kingsmill before the arrest warrant was executed. Sergeant Pitchford then prepared a search warrant for defendant's grandmother's home. The only item collected from that location was an "Uncle Mike's nylon holster" found in an upstairs bedroom.
After executing the search warrant, Sergeant Pitchford went back to headquarters to take a statement from defendant. Prior to the interview, Sergeant Pitchford read defendant an Advice of Rights Form, which defendant acknowledged with his signature. Defendant's videotaped statement was played for the jury. Throughout the interview, defendant held his hand carefully, and indicated to Sergeant Pitchford that his hand was "still messed up." No items found at the crime scene were tested for DNA and no gunshot residue tests were conducted on defendant.
On cross-examination, Sergeant Pitchford denied that he kept questioning defendant after he indicated that he wanted to end the interview. The interview ended when defendant indicated that he wanted an attorney. Sergeant Pitchford found no link during his investigation between the victim's shooting and an incident where defendant was shot in the previous year.
Detective Joseph Dewhirst testified that he was employed by the St. Charles Parish Sheriff's Office and was assigned to investigate the shooting death of Kendall Williams. In connection with that case, he interviewed two witnesses, Lamar Walker and Lou' Donovan Wells, on May 4, 2016. Detective Dewhirst first went to the scene of the shooting, where he learned that there were two witnesses that needed to be interviewed, who had already been transported to police headquarters. Lou' Donovan Wells told Detective Dewhirst that he saw defendant raise up his hand, shoot the victim in the head and then "take off." Detective Dewhirst believed that Lou' Donovan was reluctant at the beginning of the interview to identify defendant as the shooter, but as Lou' Donovan became more comfortable, he gave the name of his cousin, Javon Wells, as the shooter. Detective Dewhirst believed that the phone call to 911 was placed minutes after the shooting occurred. Lou' Donovan told Detective Dewhirst that he was risking his life by cooperating with the case, and he feared retribution from individuals who lived on Meadows Drive.
Lamar initially told Detective Dewhirst that the shooter had "black dreads" and was wearing a black shirt, but did not identify defendant before being told that his brother had identified defendant as the shooter. Detective Dewhirst testified that he believed Lamar was reluctant to tell him what had happened. Detective Dewhirst recalled that Lamar was "all over the place" during the interview, and gave different details about what he had seen, but he was aware that Lamar was in shock.
Detective Jennifer James testified that she was a detective with the St. Charles Sheriff's Office Criminal Investigation Division and participated in the investigation of Kendall Williams' shooting on May 4, 2016. Detective James assisted in canvassing the area of the shooting and in searching vehicles. As directed by Sergeant Pitchford, she asked witnesses to the shooting to indicate on a drawing of the gazebo where they were, where the victim was, and where the shooter was at the time of the shooting. The map was *1211 drawn by Sergeant Pitchford, but he was not present when Detective James showed the witnesses the map.
On the night of the shooting, Detective James walked through the surrounding neighborhood and attempted to talk to residents to ask if they had witnessed anything involving the shooting. No one provided information. Detective James' follow up attempts to locate witnesses or surveillance videos of the shooting were unsuccessful.
Shyquyle Posey ("Posey") was called as a defense witness. He testified that he knew Lou' Donovan Wells and Lamar Walker as "neighborhood friends," and was familiar with the gazebo where the shooting took place. He was in New Sarpy on the night that the victim was shot and actually heard the gunshot that killed the victim. Seconds after the gunshot, Posey saw Lamar Walker, who was "power walking" toward him. Lamar asked him, "Did you hear that and what happened?" Posey told Lamar that he did not know what happened because he was not there. Posey admitted that he had two prior misdemeanor convictions.
On cross-examination, Posey stated that he had known defendant for approximately eight years. He had communicated "once or twice" with defendant since he had been arrested. Posey never provided information to the police about seeing Lamar on the night of the shooting. Defendant's mother first contacted Posey to ask him if he knew what had happened on the crime scene. Later, Posey spoke to defendant's attorney.
LAW AND ANALYSIS
In his sole assignment of error, defendant contends that the State did not introduce sufficient evidence at trial to convict him of second degree murder.[2] Conversely, the State argues that the record contains ample evidence that defendant shot and killed the victim in this case.
The standard of review for determining the sufficiency of the evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Both direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Harrell , 01-841 (La. App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019.
Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts. State v. Kempton , 01-572 (La. App. 5 Cir. 12/12/01), 806 So.2d 718, 722. The rule as to circumstantial evidence is "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not *1212 have found proof of guilt beyond a reasonable doubt. State v. Mitchell , 99-3342 (La. 10/17/00), 772 So.2d 78, 83.
Under the Jackson standard, a review of a criminal conviction record for sufficiency of evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt, but rather whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution. State v. Flores , 10-651 (La. App. 5 Cir. 5/24/11), 66 So.3d 1118, 1122. When addressing the sufficiency of the evidence, consideration must be given to the entirety of the evidence, both admissible and inadmissible, to determine whether the evidence is sufficient to support the conviction. State v. Hearold , 603 So.2d 731, 734 (La. 1992).
Defendant challenges the sufficiency of the evidence regarding his second degree murder conviction. La. R.S. 14:30.1 provides that second degree murder is the killing of a human being when the offender has specific intent to kill or to inflict great bodily harm. Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." State v. Holmes , 12-579 (La. App. 5 Cir. 5/16/13), 119 So.3d 181, 191. Specific intent need not be proven as a fact, but may be inferred from the circumstances surrounding the offense and the defendant's conduct. Id. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person, as well as the extent and severity of the victim's injuries. Id.
In the instant case, defendant was identified by two witnesses as the shooter of the victim. Lou' Donovan Wells testified that on May 4, 2016, he saw defendant, who is his first cousin, enter the gazebo in New Sarpy while he and the victim were present. After Lou' Donovan briefly greeted defendant, he started to return to his bench in the middle of the gazebo when Williams was shot. Lou' Donovan did not see defendant draw a weapon before he shot Williams, who was watching his phone at the time. He did see after the shooting, however, that defendant was holding a small gun in his hand. After shooting Williams, defendant walked straight back to the street and "just left."
Lamar Walker testified that on May 4, 2016, he was present at the gazebo in New Sarpy. That evening, Lamar saw defendant stand by his brother, Lou' Donovan, before defendant went up to Williams and fired a single gunshot to the back of the victim's head.
Dr. Dana Troxclair, who performed the victim's autopsy, testified the victim's death was a homicide caused by a gunshot fired at the back of his head.
Defendant contends that the testimony of both Lou' Donovan Wells and Lamar Walker lack credibility because each gave multiple statements that were internally inconsistent and contradicted the account given by the other witness. These contradictions and inconsistencies were developed for the jury at trial by defendant, and included pointing out that neither Lou' Donovan nor Lamar Walker initially identified defendant as the shooter in the beginning of their interviews with the police. The jury was also presented evidence by defendant regarding inconsistent statements given by witnesses on their respective positions at the time of the shooting, as well as whether either witness actually saw defendant holding a firearm.
The credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier of fact.
*1213 State v. Jones , 08-20 (La. App. 5 Cir. 4/15/08), 985 So.2d 234, 240. The trier of fact shall evaluate the witnesses' credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. Id. It is not the function of the appellate court to second guess the credibility of witnesses as determined by the trier of fact or to reweigh the evidence. Id. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of witnesses, this is a matter of the weight of the evidence, not its sufficiency. State v. Miller , 11-498 (La. App. 5 Cir. 12/13/11), 84 So.3d 611, 617, writ denied , 12-176 (La. 9/14/12), 97 So.3d 1012.
We find that the jury made a credibility determination and chose to believe Lou' Donovan Wells and Lamar Walker, despite the inconsistencies during police interviews and in their trial testimony, that defendant shot and killed Kendall Williams. A review of the record reflects that the jury's credibility determination was rational. We note, for example, that discrepancies in the witnesses' testimony could be explained in their respective assertions that they were traumatized in just having witnessed a murder[3] and that there was a reluctance to identify defendant as the shooter because he was their relative.
Thus, viewing the evidence in the light most favorable to the prosecution and considering both admissible and inadmissible evidence, we find a rational trier of fact could have found beyond a reasonable doubt that the State proved the essential elements of second degree murder so as to support defendant's conviction. This assignment of error is without merit.
ERRORS PATENT REVIEW
The record was reviewed for errors patent, according to La. C.Cr.P. art. 920 ; State v. Oliveaux , 312 So.2d 337 (La. 1975) ; and State v. Weiland , 556 So.2d 175 (La. App. 5 Cir. 1990). Our review revealed no errors.
DECREE
Accordingly, for the reasons provided herein, defendant's conviction and sentence for second degree murder are affirmed.
AFFIRMED

The record shows that JJ's actual name is Javonte Holden.

The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal. La. C.Cr.P. art. 821. In the present case, defendant did not file such a motion; however, the failure to file a post-verdict judgment of acquittal does not preclude appellate review of the sufficiency of the evidence. State v. Robinson , 04-964 (La. App. 5 Cir. 2/15/05), 896 So.2d 1115, 1120, n.3.

Similarly, in State v. Weaver , 05-169 (La. App. 5 Cir. 11/29/05), 917 So.2d 600, this Court found sufficient identification evidence for a second-degree murder conviction despite the fact identification was made by a witness who gave several different statements to the police and was a self-proclaimed liar at trial. Stating that the credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness, this Court concluded the jury chose to believe the witness' testimony despite some discrepancies in her statement. This Court noted it was not unreasonable for the jury to excuse the discrepancies because the witness was a juvenile and was afraid. This Court further emphasized that the witness' earlier testimony implicated the defendant as being at the scene and armed with a gun during the commission of a felony even though her explanation of the incident differed from that of other witnesses.